NARRAGANSETT INDIAN TRIBE

v.

RIBO, INC. and C.B.O., Inc.

Civ. A. No. 86–0348 T.

United States District Court,
D. Rhode Island,
First Circuit Division.

June 3, 1988.

George M. Vetter, Jr., and Gordon P. Cleary, Vetter & White, Inc., Providence, R.I., for plaintiff.

Bruce D. Todesco, and Michael A. Kelly, Adler, Pollock & Sheehan, Providence, R.I., for defendants.

## OPINION

TORRES, District Judge.

This is an action to declare void two promissory notes and real estate mortgages from the Narragansett Indian Tribe (the "Tribe") to the Defendants. Plaintiff alleges that these instruments were obtained in violation of 25 U.S.C. § 81, which prohibits specified types of agreements with Indian tribes unless they are approved by the Department of the Interior.

Defendants have counterclaimed to enforce the notes and mortgages; or, in the alternative, to rescind the two deeds by which title to the subject parcels of real estate was conveyed to the Plaintiff. In addition, Defendants seek to recover the sum of $10,000 advanced by them pursuant to a related agreement which they claim has been breached by the Tribe.

## FINDINGS OF FACT

The Plaintiff is an Indian tribe, recognized as such by the United States Government. The Defendants are C.B.O., Inc. and RIBO, Inc., two Texas corporations. On July 31, 1985, representatives of the Tribe's elected Tribal Council (the "Council") entered into a written Management Agreement (the "First Agreement") with North American Bingo, Inc. ("North American"). North American is the parent corporation of both C.B.O. and RIBO. The Agreement was executed on behalf of North American by its principal, Gary Palmer, a Dallas investor and banker with a record of business dealings with Indian tribes.

The agreement contemplated acquisition by the Tribe of property on which a high stakes bingo hall could be constructed. The funds for acquiring the property and constructing the hall were to be loaned by North American which was to receive a promissory note from the Tribe for the full amount advanced. The note was to be secured by a mortgage on the property acquired and by a priority claim to any profits generated by the bingo operations. In addition, the Tribe was prohibited from encumbering any of its property without North American's consent.

The agreement also conferred on North American the exclusive right to construct the facility and manage any bingo operation conducted, either on the property to be acquired or elsewhere on the Tribe's reservation, for a period of up to 15 years. Included were the right to sell food, beverages and cigarettes; the right to select and hire all employees and the right to provide all supplies and equipment used in conjunction with the operation.

For its services, North American was to receive between 35% and 45% of the net profits in addition to any profits it realized from supplying food and equipment. The remaining net profits were to be paid to the Tribe, but only after full satisfaction of any loans and accrued management fees due North American.

The agreement further provided that, at the time it was signed, the Tribe would receive $10,000 "to help with economic development on tribal lands" with the understanding that this money would be treated as part of the construction loan, and would

be returned if not used by March 31, 1986. Such an advance was, in fact, made and deposited in a special development account controlled by the Tribal Council.

The plan to construct a bingo hall and the terms of the agreement were actively concealed from both the members of the Tribe and from the general public. Mr. Palmer attributed the secrecy to concern that the townspeople might "misinterpret" the Council's intentions.

Shortly after the First Agreement was executed, Mr. Palmer, with the apparent concurrence of the Council, selected and purchased a 17.8 acre parcel of land adjacent to the Tribe's reservation ("Parcel I"). He almost immediately conveyed it to the Tribe for $223,000, which was approximately $3,000 more than he paid for the property. Evidently, there was no formal appraisal of the property's value but Mr. Palmer acknowledged some concern as to whether the purchase price was excessive. Some basis for that concern is furnished by the fact that, on the same day Mr. Palmer acquired Parcel I, it had been purchased by his grantor for an amount indicated by the tax stamps to be $98,000.

In accordance with the terms of the First Agreement, a representative of the Tribal Council contemporaneously executed and delivered to C.B.O. the Tribe's one-year promissory note in the amount of $223,-898.85 bearing interest at the rate of 12% per year and secured by a mortgage on Parcel I. That mortgage was not recorded until approximately eight months later. The delay in recording was partially attributable to a provision in the First Agreement that the note and mortgage would be redelivered to the Tribe and the indebtedness evidenced thereby would become part of the construction loan if the Tribe's property was placed in trust status by the federal government before January 1, 1986.

The reason for that provision was the parties' desire to circumvent a federal requirement that tribal property be free of any encumbrances in order to qualify for trust status. The preoccupation with trust status, in turn, appears to have been based on the parties' further desire to insulate the bingo operation from state gambling laws.

On September 14, 1985, a second parcel of land consisting of approximately 11 acres ("Parcel II") was conveyed to the Tribe by one, Harold C. Jackson. Mr. Jackson is not a party to this suit and has no known connection to the Defendants. The purchase price was advanced by RIBO which simultaneously received the Tribe's promissory note for $45,706.47 (presumably the amount of the purchase price) secured by a mortgage on Parcel II. That mortgage, like the first one, was not recorded until March, 1986.

On October 29, 1985, a second Management Agreement (the "Second Agreement") was executed by the Council and RIBO. Its terms appear identical to those contained in the First Agreement except that the provision regarding the $10,000 advance was omitted, presumably because it had already been paid. The reason for executing a second agreement is not clear.

By January, 1986, the plans of the Council and the Defendants had begun to unravel. For reasons not made known, the Council had been unable to obtain trust status for the Tribe's land. Moreover, many members of the Tribe who were unalterably opposed to bingo operations on tribal land learned of the, theretofore, secret plan and made bingo a central issue in the then pending tribal election. When the anti-bingo slate of candidates was declared victorious by the Bureau of Indians Affairs, Defendants recorded the aforesaid mortgages and this action ensued.

## APPLICABILITY OF 25 U.S.C. § 81

The central issue in this case is whether the agreements, deeds, notes and/or mortgages in question violate 25 U.S.C. § 81.[1] That statute has its origin in the longstanding trust relationship between the federal government and Indian tribes. It was enacted "to protect the Indians from improvident and unconscionable contracts ..." *In*

---

1. There is a possibility that the deeds and mortgages violate the Indian Non–Intercourse Act, 25 U.S.C. § 177. However, that point was neither pleaded, briefed, nor argued by the parties.

*re Sanborn,* 148 U.S. 222, 227, 13 S.Ct. 577, 579, 37 L.Ed. 429 (1893).

The statute provides, in relevant part as follows:

> No agreement shall be made by any person with any tribe of Indians ... for the payment or delivery of any money or other thing of value ... or for the granting or procuring any privilege to him ... in consideration of services for said Indians relative to their lands ... unless such contract or agreement be executed and approved as follows:
>
> .      .      .      .      .
>
> Second. It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it.
>
> .      .      .      .      .
>
> All contracts or agreements made in violation of this section shall be null and void....

Clearly, the management agreements at issue in this case provide for the payment or delivery of both money and other things of value to the Defendants. The monetary consideration flowing from the Tribe to the Defendants includes the promissory notes representing the purchase prices for Parcels I and II and the unliquidated amounts for construction loans and management fees. Nor can there be any doubt that the mortgages are other things of value within the meaning of the statute.

It is equally clear that giving Defendants the exclusive right to manage high stakes bingo operations on the Tribe's land and prohibiting the Tribe from encumbering its property constitutes the grant of a privilege in consideration of services to the Narragansetts "relative to" their lands. *A.K. Management Co. v. San Manuel Band of Mission Indians,* 789 F.2d 785, 787 (9th Cir.1986); *Wisconsin Winnebago Business Committee v. Koberstein,* 762 F.2d 613, 619 (7th Cir.1985); *United States ex. rel. Shakopee Mdewakanton Sioux Community v. Pan American Management Co.,* 616 F.Supp. 1200, 1218 (D.Minn.1985), *appeal dismissed,* 789 F.2d 632 (8th Cir.1986).

■ Defendants contend that 25 U.S.C. § 81 pertains only to "tribal land" which they define as being limited to land that is part of the Tribe's reservation. However, they have cited no authority in support of that interpretation. Moreover, such a construction appears to be at variance with both the plain language of the statute and with its broad remedial purpose. Thus the statute uses the term "their [the Indians'] lands" without differentiating between original tribal lands and those subsequently acquired. Reading into those words the limitation urged by Defendants would distort their plain meaning. Moreover, it also would emasculate the statute and frustrate its purpose of providing a mechanism to regulate Indian land transactions. Indeed, it has been said that the Indian Non–Intercourse Act, 25 U.S.C. § 177, a statute having a similar objective, applies to lands acquired by tribes through purchase as well as through other means. *Alonzo v. United States,* 249 F.2d 189, 196 (10th Cir. 1957), *cert. denied,* 355 U.S. 940, 78 S.Ct. 429, 2 L.Ed.2d 421 (1958).

■ There is no question that the mandates of § 81 have not been complied with in this case. The agreements, notes and mortgages at issue are all in evidence and none bears an endorsement of approval by either the Secretary of the Interior or the Commissioner of Indian Affairs as required by the statute. Consequently, § 81 renders both agreements and the notes and mortgages given by the Tribe in accordance with their terms null and void.

The only questions remaining are whether this taint extends to the deeds *to* the Tribe and whether these Defendants are entitled to seek rescission of those deeds and/or restitution of what they have paid pursuant to the management agreements. The Court will address these issues in reverse order.

### DEFENDANTS' RIGHT TO RESTITUTION AND/OR RESCISSION

■ The general rule is that the parties to a contract which is void by reason of its illegality are not only denied the right to

enforce the contract; but, also, are denied restitution for any benefits they have conferred pursuant to it. In other words, while the Court will declare the contract void, it will neither assist the parties in carrying out their illegal bargain nor will it, ordinarily, help restore them to the positions they previously occupied by returning to them monies they paid pursuant to the contract. Except for invalidating their agreement, the Court normally leaves the parties as it finds them. *See* D. Dobbs, *Handbook on the Law of Remedies* § 13.5 (1973).

■ In this case, there is no reason to deviate from the general rule. The policy underlying § 81 and similar enactments is to afford Indians special protection with respect to the occupancy and ownership of their lands and to deter those who would deal with tribes without complying with the requirements imposed by law. Consequently, such statutes should be construed liberally to achieve that purpose and should never be construed to the prejudice of the Indians they were designed to protect. *See Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370, 380 (1st Cir.1975); *Narragansett Tribe of Indians v. Southern Rhode Island Land Development Corp.,* 418 F.Supp. 798, 806 (D.R.I. 1976).

Awarding these Defendants restitution would be inimical to the policy behind § 81. If parties entering into illegal contracts with Indian tribes were assured of being restored to the *status quo ante* in the event the transaction was invalidated, they would have nothing to lose by ignoring statutory mandates and would be encouraged to do so with impunity. The Court will not allow its powers to be invoked to create such a state of affairs.

The Court recognizes that there may be situations in which the desire to prevent unjust enrichment of tribes that knowingly participate in such transactions might outweigh the salutary rule against restitution. However, this does not appear to be one of them. Although Defendants argue that the *Council* was *in pari delicto* with them in entering into the subject agreements, it should be noted that it is the *Tribe* whose interests are at stake. Furthermore, as subsequent events demonstrated, the majority of its members was apparently unaware of and opposed to the agreements. Thus, even if the Tribe is bound by the actions of the Council, the Tribe cannot be said to have acted *in pari delicto* with the Defendants.

Applying these principles to the present case, it is clear that the Defendants are not entitled to recover the $10,000 they advanced pursuant to the First Agreement. It is equally clear that, even assuming, *arguendo,* that the deed to Parcel II is amenable to attack, the Defendants are not entitled to seek its rescission. As previously noted, the grantor under that deed was one, Harold C. Jackson, who is not a party to this suit and has no known connection to the Defendants. Rescission of that deed would re-vest title in Mr. Jackson. Apparently, the Defendants are hopeful that this would permit them to recover some of the money loaned by them to the Tribe and, in turn, paid to Mr. Jackson. In effect, they seek to accomplish indirectly what the Court has already said it will not assist them in accomplishing directly; namely, obtain restitution of money they advanced pursuant to the illegal contract.

Even more fundamental is the Defendants' lack of standing to challenge the deed to Parcel II. It is well settled that, in the absence of fraud, only the grantor, grantee or one who would take some interest in the real estate as a result of setting aside a deed may attack the deed's validity. *E.g., Norris v. Harrison,* 198 F.2d 953, 954 (D.C. Cir.1952); *City of Bluefield v. Taylor,* 365 S.E.2d 51, 55 (W.Va.1987). The Defendants do not fall into any of those categories. Therefore, they are not entitled to seek rescission of the deed to Parcel II.

RESCISSION OF DEED TO PARCEL I

■ Defendants' efforts to rescind the deed to Parcel I suffer from no such infirmity. The remedy sought is not in the nature of restitution and standing is not a problem since the grantor is Mr. Palmer, the Defendants' principal. Therefore, the

issue presented is whether the deed is void under 25 U.S.C. § 81.

There is no question that § 81 was designed to protect Indians in their dealings with others. However, in nullifying agreements that contravene its requirements, the statute does not distinguish between provisions that might be beneficial to Indians and those that might be detrimental. Thus, while there might be circumstances under which the policy of the statute might permit Indians to use it as both a sword and a shield, § 81 should generally be applied to an agreement in its entirety.

Consequently, in this case, the question of whether the deed to Parcel I comes within the purview of § 81 depends upon whether it is separable from the management agreements or so inextricably connected with them that voiding the management agreements necessarily voids the deed. In the Court's opinion, it is the latter.

The deed was given in furtherance of and shortly after execution of the First Agreement. There is no question that it was given in consideration both of the promises contained in the agreement and of the note and mortgage delivered pursuant to the agreement. There is no conceivable reason, apart from the agreement and the Plaintiff's obligations thereunder, that can account for Defendants' purchase and conveyance of Parcel I. It was an integral and indivisible part of the First Agreement.

Moreover, nullifying the deed to Parcel I does no violence to § 81's policy of protecting the interests of Indians. Nullification would leave the Tribe in no worse position than it occupied before the transaction in question. It will not result in the loss of any land previously owned by the Tribe and the Tribe has been relieved of any obligation to pay for the property that is the subject of the deed. Consequently, the deed to Parcel I, like the Agreement of which it is a part and from which it springs, is null and void.

## CONCLUSION

For all of the foregoing reasons, I hereby direct that judgment be entered declaring void the agreements dated July 31, 1985 and October 29, 1985 and the Tribe's two promissory notes and two mortgages executed on August 22, 1985 and September 16, 1985, respectively, as requested in Plaintiff's prayer for relief. I further direct that judgment be entered in favor of the Defendants on their counterclaim for rescission of the deed dated August 22, 1985. All other claims of both parties are hereby denied and dismissed.

IT IS SO ORDERED.