1998 ME 240

**FORREST ASSOCIATES**

v.

**PASSAMAQUODDY TRIBE.**

Supreme Judicial Court of Maine.

Argued Oct. 8, 1998.

Decided Nov. 6, 1998.

Christopher C. Taintor (orally), Paul F. Driscoll, Norman, Hanson & DeTroy, Portland, for plaintiff.

Gregory W. Sample (orally), Melissa A. Hewey, Drummond, Woodsum, & MacMahon, Portland, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, SAUFLEY, and ALEXANDER, JJ.

ALEXANDER, Justice.

[¶ 1]  Forrest Associates appeals from the summary judgment entered in the Superior Court (Cumberland County, *Mills, J.*), holding that 25 U.S.C. § 81 [1] rendered null and void an alleged agreement with the Passamaquoddy Tribe to develop and manage a proposed gaming facility.  Because we conclude that section 81 did not apply to the agreement that is asserted here, we vacate the judgment.

[¶ 2]  Forrest Associates (Forrest) is a Maine corporation that provides consulting services.  The Passamaquoddy Tribe (The Tribe) is a federally recognized Indian tribe with reservations in Washington County.  The tribe purchased in fee land in Albany Township in Oxford County.  Although The Tribe had been preparing to transfer title to this land to the United States in trust for the benefit of The Tribe since 1991, they did not transfer title to the United States until October 17, 1994.

[¶ 3]  In March 1994, an attorney for The Tribe approached Forrest to determine if Forrest was interested in working with The Tribe on the development of a high stakes bingo operation on the Albany Township land.  After a subsequent meeting between The Tribe and Forrest representatives, Forrest completed a study of the economic feasibility of the proposed gaming operation.  The Tribe then directed Forrest to prepare a business plan.

[¶ 4]  Forrest prepared the business plan and, on August 10, 1994, presented it to a meeting of the Joint Tribal Council of the Passamaquoddy Tribe (Joint Council).  The plan discusses the involvement of Forrest in each stage of the development and operation of the enterprise.  In general terms, the plan states that Forrest "proposes to assist in the procurement of financing for the project, su-

1.  Title 25 U.S.C.A. § 81 (1983) provides, in part:
No agreement shall be made by any person with any tribe of Indians ... for the payment or delivery of any money or other thing of value ... in consideration of services for said Indians relative to their lands ... unless such contract or agreement be executed and approved as follows:

   . . . .
   Second.  It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it.
   . . . .
   All contracts or agreements made in violation of this section shall be null and void. . . .

pervise the development process, aid in design and development decisions, and ultimately transition its role to a related entity dedicated to hospitality consulting and management, Forrest Hospitality, in order to properly manage the operation."

[¶ 5] At the end of the August meeting, the Joint Council approved a motion to proceed in accordance with the business plan, reserving certain issues of Forrest's compensation for later. From September through October 1994, Forrest continued to work on the development of the project, soliciting bids from engineering firms and working with architects on the design of the facility. In November work stopped due to the weather. The Tribe has never paid Forrest for the work it completed, and the facility has not been built.

[¶ 6] In March 1997, Forrest brought suit against The Tribe, seeking recovery for breach of contract, unjust enrichment and quantum meruit. The Tribe moved for summary judgment, claiming that 25 U.S.C. § 81 barred recovery and that there was no enforceable contract or unjust enrichment. The Superior Court found that section 81 precluded Forrest from recovering under each of their theories.

### TITLE 25 U.S.C. § 81

■ [¶ 7] Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, ... show that there is no genuine issue as to any material fact set forth in those statements and that any party is entitled to a judgment as a matter of law." M.R.Civ.P. 56(c). When reviewing a grant of summary judgment, "we view the evidence in the light most favorable to the party against whom judgment has been granted and review the trial court decision for errors of law." *June Roberts Agency v. Venture Properties*, 676 A.2d 46, 48 (Me.1996). The issue on appeal is a question of law: whether 25 U.S.C. § 81 bars Forrest's claim because their asserted contract lacked Secretary of the Interior approval. *Barona Group of the Capitan Grande Band of Mission Indians v. American Manage-* *ment & Amusement, Inc.*, 840 F.2d 1394, 1401 (9th Cir.1987).

■ [¶ 8] Title 25 U.S.C. § 81 provides that any agreement for the payment of "money or other thing of value ... in consideration for services for ... Indians relative to their lands" must be approved by the Secretary of the Interior. If the contract is not approved by the Secretary, it "shall be null and void." *Id.* A contract is governed by section 81 only if it is "relative to Indian lands." *See Penobscot Indian Nation v. Key Bank of Maine*, 112 F.3d 538, 545 (1st Cir. 1997). To determine whether the contract is "relative to [Indian] lands" we must first evaluate whether the land on which The Tribe proposed to build the bingo facility is "Indian land" as understood within the statute.

■ [¶ 9] In *Penobscot Indian Nation*, the United States Court of Appeals for the First Circuit held that section 81 did not apply to "land that an Indian tribe purchased in fee simple for investment purposes." 112 F.3d at 546; *see also Native Village of Eyak v. GC Contractors*, 658 P.2d 756, 760 (Alaska 1983) (holding that section 81 did not apply to a contract to build a community center on land that was leased from a non-Indian third party). The court predicated its decision "primarily on the distinctions between Indian trust or tribal lands ... and lands that Indian tribes hold in fee simple." *Penobscot Indian Nation*, 112 F.3d at 546. Indian trust land is property "the title to which the United States holds in trust for an Indian tribe." *Id.* at 546. By contrast, fee simple lands are "those in which the owner 'is entitled to the entire property, with unconditional power of disposition.'" *Id.* (quoting BLACK'S LAW DICTIONARY 615 (6th ed. 1990)).

■ [¶ 10] The plain language of section 81 does not distinguish between land owned in fee simple and land held in trust. Examination of the ordinary meaning of the term "Indian lands," relevant case law, and the historic relationship between the federal government and Indian tribes, demonstrates that section 81 does not govern a contract concerning land not held in trust by the U.S.

government at the time the contract is formed.

[¶ 11] "Indian lands" is defined as "[r]eal property ceded to the U.S. by Indians, commonly to be held in trust for Indians." *Penobscot Indian Nation*, 112 F.3d at 547 (quoting BLACK'S LAW DICTIONARY 771 (6th ed. 1990)). The definition of "Indian tribal property" is similar: "real property the title to which is vested in [the] United States but held in trust for the Indians." *Id.* When used in the context of section 81, the term Indian lands "is understood to refer to Indian trust lands." *Id.* at 547 (citing FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW at 318 n. 293 (Rennard Strickland *et al.* eds., 1982)).

[¶ 12] Federal courts that have analyzed whether a contract concerning the management of a gaming facility by a non-Indian firm for an Indian tribe is "relative to [Indian] lands" have generally focused on the fact that the land on which the facility was located was Indian trust or tribal lands.[2] *See Penobscot Indian Nation*, 112 F.3d at 550; *see also A.K. Management Co. v. The San Manuel Band of Mission Indians*, 789 F.2d 785, 787 (9th Cir.1986); *Wisconsin Winnebago Business Comm. v. Koberstein*, 762 F.2d 613, 619 (7th Cir.1985); *United States ex rel. The Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enterprise Management Consultants, Inc.*, 734 F.Supp. 455, 456–57 (W.D.Okla.1990) (finding section 81 applicable to an agreement where non-Indian firm "possessed the exclusive right to operate bingo games on tribal land."); *cf. American Management & Amusement, Inc.*, 840 F.2d at 1403–04.[3]

[¶ 13] Historically the relationship between the federal government and Indian tribes has been a "trust relationship ... 'resembling that of a ward to his guardian.'"

*Penobscot Indian Nation*, 112 F.3d at 546 (quoting *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831)). One manifestation of this relationship is that in 1872, the year that Congress passed section 81, the federal government possessed title to all Indian lands and the Indian tribes had only a right to occupancy. *Id.* at 548–49 (citing federal case law and legislation).

[¶ 14] Interpreting section 81 in light of the status of Indian lands in the late nineteenth century, courts have concluded that the statute is "predicated on the trust relationship between the federal government and the Indian tribes." *See Penobscot Indian Nation*, 112 F.3d at 552. Applying section 81 to Indian land held in fee simple would, therefore, contradict "the statute's purpose and its drafters' intentions." *Id.* Such an interpretation would force the federal government to "exercise a trust responsibility with respect to lands over which Congress" had no trust obligation. *See Id.* at 553.

[¶ 15] In reaching its conclusion, the First Circuit in *Penobscot Indian Nation* rejected the holding in *Narragansett Indian Tribe v. RIBO, Inc.*, 686 F.Supp. 48 (D.R.I. 1988). 112 F.3d at 552–53. The court in *Narragansett Indian Tribe* applied section 81 to a gaming management agreement that contemplated the acquisition of land on which a bingo facility would be built. 686 F.Supp. at 51. The Tribe purchased the land, but did not transfer the land into trust. *Id.* at 50. When the Tribe contended that the agreement was void under section 81, the non-Indian defendants argued that the section did not apply to the contract because it did not concern "tribal land." *Id.* at 51. The court rejected the defendant's construction of the statute, reasoning that such an interpretation would be at odds with the statute's

---

**2.** Indian trust lands and Indian tribal lands are used interchangeably and are synonymous. *See Penobscot Indian Nation*, 112 F.3d at 546 n. 10.

**3.** In *Koberstein* the court cites *American Management* to illustrate the importance of the existence of tribal trust land in evaluating whether a contract is relative to Indian lands. 112 F.3d at 551. The contract in *American Management*, however, involved reservation lands. There is no indication of whether of not the lands were held in

trust by the United States. 840 F.2d at 1404; *see also United States ex rel. Morongo Band of Mission Indians v. Rose*, 34 F.3d 901, 905 (9th Cir. 1994) (noting that the *American Management* court held that section 81 was applicable when the lands involved "apparently were not trust lands."). Because we are not dealing with reservation lands in this case, we need not address how section 81 might apply to non-trust reservation lands if such a status exists.

"broad remedial purpose" and would "emasculate the statute and frustrate its purpose of providing a mechanism to regulate Indian land transactions." *Id.* at 51.

[¶ 16] The court in *Penobscot Indian Nation* agreed with the construction of the statute proffered by the defendants in *Narragansett Indian Tribe*, and held that "Indian fee lands purchased for investment purposes and not designated as trust lands" do not qualify as Indian lands under section 81. 112 F.3d at 553–54. Given the First Circuit's acceptance of the defendant's argument in *Narragansett Indian Tribe*, we conclude that if presented with facts analogous to those in *Narragansett Indian Tribe* the First Circuit would hold that section 81 was not applicable.

[¶ 17] The only difference between the facts in *Narragansett* and the facts in this case is that here The Tribe eventually obtained trust status. There is no indication in *Penobscot Indian Nation* that such a difference would change the First Circuit's analysis. A change in the analysis would be incorrect for two reasons. First, to apply section 81 to a contract when a Tribe eventually obtains trust status, but not when a Tribe was unable to obtain trust status, would make application of section 81 dependent on events that occur after the formation of the agreement and over which the non-Indian party has no control. Second, to apply the statute—which is predicated on the trust relationship between Indian Tribes and the federal government—to land that was not trust land "would force the Secretary to exercise a trust responsibility with respect to lands over which Congress" has no trust obligation. *See Penobscot Indian Nation*, 112 F.3d at 553.

[¶ 18] Given the common use of the term "Indian lands," the importance of the existence of tribal trust lands to federal courts' analysis of section 81, and the historic relationship between the federal government and Indian tribes, we hold that section 81 is not applicable to the agreement asserted by Forrest concerning land not held in trust by the federal government at the time the parties formed the alleged contract.

The entry is:

Judgment vacated. Remanded to the Superior Court for further proceedings consistent with this opinion.

