2000 ME 20

**Evelyn KIMBALL et al.**

v.

**LAND USE REGULATION COMMISSION et al.**

Supreme Judicial Court of Maine.

Argued Sept. 10, 1999.

Decided Feb. 7, 2000.

Jeffrey Rosenblatt (orally), Berman & Simmons, P.A., Lewiston, Margaret D. Wille (orally), Hebron, John M.R. Paterson, Bernstein, Shur, Sawyer & Nelson, P.A., Portland, for plaintiffs.

Gregory W. Sample (orally), Barbara L. Goodwin, Drummond Woodsum & MacMahon, Portland, for defendant Passamaquoddy Tribe.

Andrew Ketterer, Attorney General, Jeffrey Pidot, Asst. Attorney General (orally), Augusta, defendant for LURC.

Before CLIFFORD, RUDMAN, DANA, and SAUFLEY, JJ.

SAUFLEY, J.

[¶ 1] The Passamaquoddy Tribe and the Land Use Regulation Commission appeal from a judgment entered in the Superior Court (Kennebec County, *Humphrey, J.*) vacating LURC's approval of the Tribe's application for the rezoning of a parcel of land in Albany Township. The court concluded that the parcel was not "Indian territory" as defined by 30 M.R.S.A. § 6205 (1996) and therefore concluded, as a matter of law, that a proposed high stakes bingo facility could not be built on that parcel. *See* 17 M.R.S.A. § 314–A(5) (Supp.1999). We agree with the Superior Court that the Albany land is not yet Indian territory, and we affirm the judgment.

## I. BACKGROUND

[¶ 2] In 1980, the State of Maine reached a settlement with the Passamaquoddy Tribe and two other tribes regarding these tribes' land claims against the state. To facilitate the settlement,[1] Congress passed the Maine Indian Claims Settlement Act, which, inter alia, terminated all land claims of the Passamaquoddys against Maine,[2] established a land acquisition fund, and authorized the United States Secretary of the Interior (the Secretary) to expend portions of this fund to acquire tribal land as trustee for the Tribe. *See* 25 U.S.C.A. § 1724 (1983).[3] As a result of the settlement, the Legislature passed An Act to Implement the Maine Indian Claims Settlement Act (Implementing Act), which in part set up a statutory scheme under which certain parcels of land would be

1. The Implementing Act was passed contingent upon passage and signing into law of the federal legislation. *See* P.L.1979, ch. 732, § 31.

2. The Act also settled the claims of the Penobscot Nation and the Houlton Band of Maliseet Indians. *See* 25 U.S.C.A. § 1724 (1983).

3. The relevant portion of the Settlement Act is as follows:

   **§ 1724. Maine Indian Claims Settlement and Land Acquisition Funds in the United States Treasury**

   ....

   **(d) Apportionment of land acquisition fund; expenditures for acquisition of land or natural resources; trust acreage; fee holdings; interests in corpus of trust for Houlton Band following termination of Band's interest in trust; agreement for acquisitions for benefit of Houlton Band: scope, report to Congress**
   The principal of the land acquisition fund shall be apportioned as follows:
   (1) $900,000 to be held in trust for the Houlton Band of Maliseet Indians;
   (2) $26,800,000 to be held in trust for the Passamaquoddy Tribe; and
   (3) $26,800,000 to be held in trust for the Penobscot Nation.
   The Secretary is authorized and directed to expend, at the request of the affected tribe, nation or band, the principal and any income accruing to the respective portions of the land acquisition fund for the purpose of acquiring land or natural resources for the Passamaquoddy Tribe, the Penobscot Nation, and the Houlton Band of Maliseet Indians and for no other purpose. *The first 150,000 acres of land or natural resources acquired for the Passamaquoddy Tribe and the first 150,000 acres acquired for the Penobscot Nation within the area described in the Maine Implementing Act as eligible to be included within the Passamaquoddy Indian Territory and the Penobscot Indian Territory shall be held in trust by the United States for the benefit of the respective tribe or nation....*

   ....

   25 U.S.C.A. § 1724(d) (1983) (emphasis added).

designated "Indian territory." P.L.1979, ch. 732 (codified as amended at 30 M.R.S.A. §§ 6201–6214 (1996 & Supp. 1999)).[4] Subsequently, the Legislature enacted a provision allowing the Tribe to operate one high stakes bingo or beano facility in the state on Indian territory. *See* 17 M.R.S.A. § 314–A(5). Because high stakes bingo is not otherwise allowed to operate in the state, whether a parcel qualifies as Indian territory under the Implementing Act directly controls the potential location of any high stakes bingo or beano facility.

[¶ 3] In 1988, the Tribe purchased a parcel of land in Albany Township from a tribal member. On January 7, 1992, following approval by the Maine Indian Tribal–State Commission, a bill was introduced in the Legislature on behalf of the Tribe which amended 30 M.R.S.A. § 6205 to include the Albany parcel among the lands which could potentially become Passamaquoddy Indian territory. *See* L.D.2081 (115th Legis.1992). The bill was passed and signed into law on March 23, 1992, and became effective on June 30, 1992. *See* P.L.1991, ch. 720 (hereinafter 1992 Amendment).[5] It added to the list of parcels of land that could be designated Indian territory "any lands in Albany Township acquired by the Passamaquoddy Tribe before January 1, 1991." *See id.*

[¶ 4] Section 6205 also contained a preexisting requirement that any such land be transferred to the Secretary in trust and certified as accepted by the Sec-

retary on or before January 31, 1991, in order finally to become Indian territory. *See* 30 M.R.S.A. § 6205. The 1992 Amendment did not amend that date. The prerequisite of the 1991 approval, therefore, created a conundrum. The Secretary of the Interior could not accept the land in trust until the state formally approved it for the trust. Yet, the state approved the Albany land for placement in trust within a statutory scheme that required, in order for the land to become Indian territory, that the Secretary of the Interior accept the land before the date that the Legislature approved it for placement in trust. Although the Tribe ultimately did transfer the parcel to the Secretary, the acceptance by the Secretary was not accomplished until over two and a half years later, on October 21, 1994.

[¶ 5] In 1997, acting on the assumption that the land in question was Indian territory as required by 17 M.R.S.A. § 314–A(5), the Tribe applied to LURC requesting that the Albany parcel be rezoned as "General Development," and further requesting that a development permit be issued to allow construction of a high stakes bingo facility. Various governmental bodies reviewed and commented on the proposal. Several voiced significant concerns.

[¶ 6] Area residents requested a public hearing. Jeffrey Rosenblatt, on behalf of himself, Evelyn Kimball, and others, petitioned to intervene. LURC received a number of letters opposing the project. In

---

4. The relevant portion of the statute is as follows:

§ 6205. Indian territory

**1. Passamaquoddy Indian territory.** Subject to subsections 3, 4 and 5, the following lands within the State are known as the "Passamaquoddy Indian territory:"

. . . .

**B.** The first 150,000 acres of land acquired by the secretary for the benefit of the Passamaquoddy Tribe from the following areas or lands to the extent that those lands are acquired by the secretary prior to January 31, 1991, are not held in common with any other person or entity and are certified

by the secretary by January 31, 1991, as held for the benefit of the Passamaquoddy Tribe:

. . . any lands in Albany Township acquired by the Passamaquoddy Tribe before January 1, 1991; . . .

. . . .

30 M.R.S.A. § 6205(1)(B).

5. The federal Settlement Act provided that no change in the Maine statute could become effective without the Tribe's approval. *See* 25 U.S.C.A. § 1725(e)(1) (1983). The Tribe approved the 1992 Amendment by vote of the Joint Tribal Council on April 6, 1992.

general, the letters raised concerns regarding increased taxes to support public services to the facility, noise, flooding, pollution of the Crooked River, the general incompatibility of the project with existing settlement, and the lack of need for or benefit from the project for the local community. In addition, many letters in favor of the project were received.

[¶ 7] LURC held a two-day hearing at which it considered both prefiled statements and live testimony. Additional post-hearing materials were submitted on both sides of the issue. Rosenblatt sought to keep the record open for the filing of additional facts. After denying Rosenblatt's request, LURC granted both the rezoning request and the development permit. Petitions for judicial review were filed in the Superior Court by Rosenblatt, on behalf of himself and others, and by Evelyn Kimball and Margaret Wille. *See* 5 M.R.S.A. § 11001–11008 (1989); M.R. Civ. P. 80C. Both the Rosenblatt Petitioners and the Kimball Petitioners filed motions to supplement the agency record in the Superior Court, which were granted in part by the court (*Alexander, J.*).

[¶ 8] After a hearing, the Superior Court (*Humphrey, J.*) held that the Albany parcel was not Indian territory under section 6205. Because high stakes bingo would be an illegal use on land that is not Indian territory, the court concluded that LURC's rezoning of the parcel was improper and that LURC had erred as a matter of law when it granted a development permit for an illegal use. The Tribe, LURC, and the

Kimball and Rosenblatt Petitioners each appealed from the court's judgment.[6]

[¶ 9] The matter before us requires us to determine whether the Albany land has become Indian territory. To do so, we must determine the consequences of the Legislature's omission of a new deadline for acceptance by the Secretary.

## II. DISCUSSION

### A. The Statute

[¶ 10] There is no dispute that the casino the Tribe wishes to build may only be placed on "Passamaquoddy Indian territory." Passamaquoddy Indian territory is defined in the Implementing Act as "that territory defined by section 6205, subsection 1." 30 M.R.S.A. § 6203(6) (1996). Section 6205, subsection 1 describes Passamaquoddy Indian territory as including the Passamaquoddy Indian Reservation, *see* 30 M.R.S.A. § 6205(1)(A), and the first 150,000 acres of land acquired by the Secretary of the Interior for the benefit of the Tribe, *see* 30 M.R.S.A. § 6205(1)(B). In order to become Indian territory pursuant to section 6205(1)(B), those lands must be identified in section 6205, must be acquired by the Secretary prior to January 31, 1991, must be certified by the Secretary as held for the benefit of the Tribe by January 31, 1991, and must not be held in common with any other person or entity. *Id.*

[¶ 11] The final paragraph of section 6205 creates a further limitation on the creation of new "Indian territory."[7] Sec-

---

6. In addition, the Rosenblatt Petitioners moved for certification of the Superior Court's judgment, which was, denied, and moved that the Tribe's appeal be dismissed as premature. Rosenblatt no longer presses the argument that the Superior Court's decision was not final.

7. The statute reads as follows:

    **5. Limitations.** No lands held or acquired by or in trust for the Passamaquoddy Tribe or the Penobscot Nation, other than those described in subsection 1, 2, 3, and 4, shall be included within or added to the Passa-

maquoddy Indian territory or the Penobscot Indian territory except upon recommendation of the [Maine Indian Tribal–State Commission] and approval of the State to be given in the manner required for the enactment of laws by the Legislature and Governor of Maine, provided, however, that no lands within any city, town, village or plantation shall be added to either the Passamaquoddy Indian territory or the Penobscot Indian territory without approval of the legislative body of said city, town, village or plantation in addition to the approval of the State.

30 M.R.S.A. § 6205(5) (1996).

tion 6205(5) provides that no land except land described in subsections 1 through 4 shall become Indian territory except upon: (1) recommendation by the Maine Indian Tribal–State Commission; (2) enactment of a law by the Legislature approving the Commission's recommendation; (3) signature of the legislation by the Governor; and (4) approval by the legislative body of the municipality (when the parcel is located in a city, town, village, or plantation). 30 M.R.S.A. § 6205(5).

B. Applicability of Section 6205(5)

[¶ 12] Because the land does not meet the requirements of the plain language of section 6205(1)(B), the Tribe argues that section 6205(5) provides a freestanding method for the creation of Indian territory. It further asserts that the elements of this section have been met and that therefore the Albany land has become Indian territory notwithstanding the temporal requirement of subsection 1.

[¶ 13] Subsection 5 provides prerequisites to the creation of new Indian territory "other than [the lands] described in subsections 1, 2, 3, or 4." It appears to place limitations on the creation of new Indian territory and permits the creation of that territory only if its requirements are met.[8] Contrary to the Tribe's contentions, however, mere compliance with the requirements of subsection 5 will not be sufficient to create new Indian territory if the Legislature places additional conditions on the process. In other words, even if the Tribe's interpretation of subsection 5 is correct, subsection 5 does not obviate the need for compliance with whatever other statutory conditions are imposed by the Legislature.

[¶ 14] When the Legislature enacted P.L.1991, ch. 720, it authorized the addition of "any lands in Albany Township ..." acquired "by the secretary prior to January 31, 1991." No lands in Albany Township satisfy that legislative condition and, therefore, the Tribe cannot rely on the legislation signed into law on March 23, 1992, see L.D.2081 (115th Legis.1992), to satisfy the statutory prerequisites of section 6205(5). The Tribe's reliance on the provisions of section 6205(5) cannot substitute for compliance with the explicit requirements of section 6205(1)(B).[9]

C. Interpretation of Section 6205(1)(B)

[¶ 15] We turn then to the task of addressing the amendments to section 6205(1)(B) by which the Albany land was added to those properties that may become Indian territory. The difficulty presented by the Tribe's current effort to use the Albany land as Indian territory may be stated as follows: when the Legislature amended section 6205(1)(B) in 1992 to add the Albany land to those properties specifically named as eligible to become Indian territory, it did not amend the statute to extend the 1991 date by which the Secretary must acquire that Albany parcel land in trust and certify it as held for the Tribe's benefit. Although the land had been purchased by the Tribe before the bill was enacted, it had not been acquired by the Secretary nor certified as held for the Tribe's benefit, nor could it have been taken by the Secretary prior to legislative action in 1992. See 25 U.S.C. § 1724(d).[10]

---

8. See Op. Me. Att'y Gen. 86–11 (concluding that subsection 5 provides a method of creating Indian territory).

9. The Legislature could have addressed the Albany lands outside of the strictures of section 6205(1)(B). For example, it later included land in Calais through a bill which created an entirely new subparagraph in which the newly added land was addressed separately from those lands addressed in section 6205(1)(B). See P.L.1993, ch. 713, § 1 (adding 30 M.R.S.A. § 6205(1)(C)).

10. The Implementing Act and the Settlement Act must be read together as the "statutory scheme." Reading the Acts together, there was no way for the Secretary to receive the Albany parcel in trust prior to January 31, 1991, because the Secretary was unable to become trustee over the parcel until the Legislature acted to add the Albany land to the

In other words, on the face of the statute, the Albany land could not become Indian territory without further legislative action.

[¶ 16] LURC and the Tribe argue that the Legislature's intent in enacting the 1992 Amendment was to allow the Albany land to become Indian territory, within a reasonable period of time, without further action on the part of the Legislature. They urge us to effectuate that legislative intent either by declining to accept the plain language of section 6205(1)(B) or by augmenting that language to allow acceptance by the Secretary on the date the land was actually accepted.

[¶ 17] The intervenors argue that we need not consider legislative intent because the language of the statute is plain on its face. Because the statute is neither ambiguous nor absurd on its face, they argue that the court properly confined its construction of the statute to the plain meaning of its words. In addition, they assert that, even if we were to look to legislative intent, it is not possible to discern the Legislature's intent *with regard to the date* by which the Secretary must certify the land.

### 1. Canons of Statutory Interpretation

[¶ 18] Because statutory construction is a matter of law, we review decisions regarding the meaning of a statute de novo. *See Estate of Jacobs*, 1998 ME 233, ¶ 4, 719 A.2d 523, 524. We have set forth the general rules for statutory construction as follows:

> We look first to the plain meaning of the statutory language as a means of effecting the legislative intent. Where the statutory language is ambiguous, we examine other indicia of legislative intent, such as legislative history. The statutory scheme from which the language arises must be interpreted to achieve a harmonious outcome. We will not con-

strue statutory language to effect absurd, illogical, or inconsistent results.

*Coker v. City of Lewiston*, 1998 ME 93, ¶ 7, 710 A.2d 909, 910 (citations omitted). " 'If the meaning of this language is plain, we must interpret the statute to mean exactly what it says.' " *Rowe v. Chapman Trucking*, 629 A.2d 1224, 1226 (Me.1993) (quoting *Concord Gen. Mut. Ins. Co. v. Patrons Oxford Mut. Ins. Co.*, 411 A.2d 1017, 1020 (Me.1980)). Stated succinctly, when the language chosen by the Legislature is clear and without ambiguity, it is not the role of the court to look behind those clear words in order to ascertain what the court may conclude was the Legislature's intent.

[¶ 19] These rules of construction are applied to effectuate several purposes. First, the court should give meaning to the language chosen by the Legislature to the greatest extent possible. *See Opinion of the Justices*, 460 A.2d 1341, 1346 (Me. 1982). Second, the court has no role in attempting to divine legislative intent where the words chosen by the Legislature are clear and unambiguous. *See Rowe*, 629 A.2d at 1226. And finally, only when the words are susceptible of multiple meanings, or render the enactment an absurdity or nullity, should the court explore indicia of legislative intent. *See Coker*, 1998 ME 93, ¶ 7, 710 A.2d at 910.

### 2. Treatment of Unambiguous Language

[¶ 20] Here, the language used by the Legislature is not ambiguous. It is not necessary to interpret the language of the provisions at issue in order to understand its meaning. Applying that language to the matter at hand, the Albany parcel met all of the conditions precedent to becoming Indian territory except one-it was not

applicable provision of the Implementing Act in 1992. *See* 30 M.R.S.A. § 6205; 24 U.S.C. § 1724(d).

placed in trust with the Secretary and certified before January 31, 1991.[11]

[¶ 21] We must decide, then, not whether legislative intent will bring clarity to an ambiguity, but whether the plain and unambiguous language of the Act, which appears not to have included the final amendment necessary to the transmutation of the land into Indian territory, may be augmented by the Court in order to complete the process.

■ [¶ 22] The only circumstance where we may go behind the plain language of an unambiguous statute to discern the Legislature's true intent is where the language at issue renders the enactment absurd or a nullity. *See Coker*, 1998 ME 93, ¶ 7, 710 A.2d at 910; *Struck v. Hackett*, 668 A.2d 411, 417 (Me.1995). An enactment will be considered a nullity when it has no effect whatsoever. *See Opinion of the Justices*, 460 A.2d at 1346. That is not the case here. The action by the Legislature cannot be considered a nullity because the Albany land has, in fact, been identified and added to the list of lands that may become Indian territory upon the completion of other acts. Completion of the process may yet occur upon the Legislature's

extension of the date by which the Secretary of the Interior must have accepted the land in trust. The Legislature knows how to amend that date; it had extended the date on multiple occasions prior to its addition of the Albany land to subsection 1.[12] It could have extended that date at any time following the enactment of the 1992 Amendment. That it has not done so to date does not render its original action a total nullity.[13]

■ [¶ 23] For similar reasons, the provision does not constitute an absurdity. An absurdity may occur when the enactment is so contrary to the plain understanding of legislative intent and the entire statutory scheme within which the amendment falls that enforcement of the plain language would be wholly unreasonable. The enactment at issue simply did not contain a necessary step toward creation of Indian territory. Nothing in the language of the Act or the provisions of the federal Settlement Act persuades us that the omission of that step renders the enactment an absurdity. *See Ballard v. Edgar*, 268 A.2d 884, 887 (Me.1970) (recognizing the possibility that the language resulted from "mere legislative inadver-

11. Although we noted that the Albany land had been placed in trust in 1994 in *Forrest Associates v. Passamaquoddy Tribe*, 1998 ME 240, 719 A.2d 535, *id.* ¶ 17, 719 A.2d at 539, we did not reach the question presented here: whether the land had become Indian territory in accordance with the requirements of section 6205. As our holding today makes clear, placement in trust with the Secretary and the creation of Indian territory are distinct events, the latter of which requires an additional, temporally limited step-the transfer into trust must occur by a certain date.

12. *See, e.g.*, P.L.1983, ch. 493, § 1; P.L.1983, ch. 660, § 1; P.L.1985, ch. 637, § 1; P.L. 1983, ch. 747, § 2; P.L.1987, ch. 153, § 1. Each of those extensions occurred before the enactment of P.L.1991, ch. 720. At the same time that chapter 720 was enacted, the Legislature amended the provisions effecting the creation of *Penobscot* Indian territory, extending the deadline related to Penobscot land to 2001. *See* P.L.1991, ·ch. 721, § 1. It could have, but did not, do the same for Passama-

quoddy land, and declined to extend the Passamaquoddy deadline again on at least one other occasion. *See* L.D. 964 (118th Legis.1997) (proposing, in addition to the deadline change, that other lands in Albany adjacent to the parcel in question be eligible for placement in trust).

13. Nor is the Tribe's argument that the later amendment trumps the previous statutory provision persuasive. "Where two statutes are involved each of which by its terms applies to the facts before the court, the statute which is the more recent of the two irreconcilably conflicting statutes prevails," 2B NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 51.02 (5th ed.1992). We are not, however, confronted with two statutes, each requiring specific and incompatible dates by which the Secretary must accept the land in trust and certify it as accepted. Rather, we are asked to divine a date which the more recent amendment failed to provide.· The "recency" canon urged upon us by the Tribe is inapplicable to the circumstances at hand.

tence," but declining to disregard the plain language).[14]

[¶ 24] Moreover, even if we were to accept the Tribe's argument that the missing extension of the deadline renders the language of section 6205(1) ambiguous or absurd, there is no basis in the record from which we could divine a new deadline for the Secretary's acceptance. In order to bridge the gap between the plain language of the statute and the result sought by the Tribe, we would need to read into the statute a particular date, somehow applicable only to the Albany parcel,[15] by which the Secretary of the Interior must have accepted the land in trust. Further, we would have to read out of the statute the existing date. In so doing, we would have to make assumptions about legislative intent regarding that date. Neither party has provided persuasive legislative history applicable to this particular point. There is no mention in the Statement of Fact accompanying the bill or other documents properly relied on for analysis of legislative intent of a date by which the Secretary's acceptance must have occurred. We would therefore have to speculate as to the Legislature's intent regarding such a date at the time of the enactment in 1992.

[¶ 25] The difficulty of such speculation becomes evident upon asking the question: what date did the Legislature intend? In the absence of any guidance on that point, we would have to infer a logical date. If we inferred a date that was exactly one year from the enactment of the original addition of the Albany land to section 6205(1), the land would still not have become Indian territory because it was not accepted by the Secretary within that year. Similarly, if we inferred a date exactly two years from the date of the statute's enactment, the Tribe's desired result would still not have been accomplished. In the end we would be required, with the benefit of hindsight, to decide today that the Legislature meant to allow the Secretary of the Interior to accept the land more that two and one half years after the statute was enacted.[16]

[¶ 26] Just as we are not free to interpret a statute so as to render a provision a surplusage, see *Struck*, 668 A.2d at 417, such as would be the case were we to read out of the statute the existing date of January 31, 1991, so too we are not free to substitute a different date for the existing one. Such speculation and legislative redrafting is wholly outside of our role as a court.

[¶ 27] Although it is apparent that the Legislature intended to begin the process of creating Indian territory in the Albany parcel, it did not complete the steps necessary to accomplish that goal. It is the role of the Legislature, not this Court, to determine if, when, and under what circumstances the land should actually become Indian territory. Because the parcel has

---

**14.** *See also Lopez–Soto v. Hawayek*, 175 F.3d 170, 173 (1st Cir.1999) ("Courts have an obligation to refrain from embellishing statutes by inserting language that Congress opted to omit.") (citing *Keene Corp. v. United States*, 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993)).

**15.** If the appellants are correct in their assertion that the Legislature intended the Albany land to become Indian territory without further action by the Legislature, it must also have intended, when it inserted that parcel into section 6205(1)(B), to have once again extended the date by which *all* lands listed therein could be accepted and certified by the Secretary. Neither the Tribe nor LURC argue that the Legislature intended to change the date with respect to all of the other lands listed in subsection 1.

**16.** The appellants' argument that we need not identify the deadline is disingenuous. The Legislature has never, either before or after the 1992 Amendment, enacted an entirely open-ended process regarding specific land.

not yet achieved the status of Indian territory, the Superior Court did not err in concluding that the casino may not be built on that land. Accordingly, we need not address the challenges to LURC's approval of the application.

The entry is:

Judgment affirmed.