STATE OF MAINE

KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-00-37
AP-00-42

JWA-KEN - 6/(C 2001

CONSUMERS FOR AFFORDABLE
HEALTH CARE, *et al.*,

Petitioners

v.

**DECISION AND ORDER**

SUPERINTENDENT OF
INSURANCE, *et al.*,

Respondent

This matter is before the court on motion of the Superintendent of Insurance to strike the Attorney General's independent claim and to dismiss the same. This matter was commenced by the Attorney General filing, on June 26, 2000, a petition for review of final agency action pursuant to M.R. Civ. P. 80C, and independent claim for relief. Petitioner asks the court to find that a decision of the Superintendent of Insurance in regard to the application of Associated Hospital Service of Maine, d/b/a Blue Cross/Blue Shield of Maine, to convert to a stock insurer was in violation of statute, affected by error of law or unsupported by substantial evidence on the record. The Attorney General further seeks to modify the decision to require an updated appraisal and appropriate compensation for the charitable foundation created in conjunction with legislation authorizing the conversion. In a separate action, subsequently consolidated by this court, Consumers for Affordable Health Care, on June 5, 2000, brought a petition for review of final agency action pursuant to M.R. Civ. P. 80C seeking review of the action.

This matter involves a challenge by the Consumers for Affordable Health Care and the Attorney General to the decision of the Superintendent of Insurance to approve, subject to conditions, the conversion of Blue Cross/Blue Shield of Maine to a domestic stock insurer and the acquisition of substantially all of the assets of Blue Cross/Blue Shield by a subsidiary of Anthem Insurance Companies, Inc. Legislation enacted by the Legislature in 1997 addressed the conversion issue and established two requirements.

First, the Attorney General was to create a charitable trust with court approval and, second, the Superintendent of Insurance was given the responsibility for approving the terms of the conversion and acquisition of Blue Cross/Blue Shield of Maine. Under the legislation, the charitable trust created by the Attorney General is to receive the fair market value from the sale of Blue Cross/Blue Shield assets. In its independent claim, the Attorney General seeks to exercise his implied powers with regard to charitable organizations by challenging the value of Blue Cross/Blue Shield as determined by the Superintendent in an effort to require additional funds to be deposited into the charitable trust. It is an independent claim because the Superintendent of Insurance clearly has no authority to order Anthem to provide additional funds now that the Superintendent's decision has been rendered and the conversion has taken place.

The Superintendent seeks dismissal of the independent action because he believes the essence of the Attorney General's administrative appeal is that the Superintendent did not properly determine the fair market value of Blue Cross/Blue Shield of Maine and this challenge is redundant of his 80C petition for review. The Superintendent asserts that the Attorney General's authority over charities does not

2

create an independent right to file this action against a non-charity such as the Superintendent of Insurance because, among other reasons, the statutory jurisdictional basis authorizing the Attorney General to enforce "due application of funds given or appropriated to public charities within the state and prevent breaches in trust in the administration thereof" (5 M.R.S.A. § 194) does not provide a basis upon which the Attorney General can sue a non-charity, ". . . much less another arm of state government." Petitioner's motion, p.5. The Superintendent further argues that the statutes governing the transaction contemplate that the Administrative Procedure Act (APA) and Rule 80C provides the exclusive remedy for challenging the Superintendent's decision. The Superintendent goes on to complain that the Attorney General's claim is not an "independent" action in that the administrative appeal and the independent claim make the same factual allegation and seek the same relief.

Independently, Anthem Insurance Companies, Inc. and Anthem Health Plans of Maine, Inc. challenge the Attorney General's independent claim by arguing that it is a "noncognizable collateral attack" on the decision and is barred by the Law Court decision of *Fitzgerald v. Baxter State Authority*, 385 A.2d 189 (Me. 1978). Anthem's motion, p. 1. Anthem, too, argues that the APA review is the exclusive avenue for challenging the failure of the Superintendent to comply with the law and further asserts that the Attorney General's claim is a collateral attack which ignores the Superintendent's ruling. For support of this proposition, it cites *Lovell v. One Bancorp*, 614 A.2d 56 (Me. 1992). Anthem also argues that the Attorney General should be estopped from making such a claim since his activity with the charitable trust and that trust approval of the transaction constitutes a waiver of such complaint.

3

To all this, the Attorney General relies upon his interpretation of the common law and statutory duties as chief law enforcement officer of Maine, as well as the more specific administrative review responsibility in the statute. *See* 5 M.R.S.A. §§ 194 & 194-A. The Attorney General cites a large body of cases approving the exercise of his authority in dealing with charitable trust matters including language from *Lund ex rel. Wilbur v. Pratt*, 308 A.2d 554 (Me. 1973) which confirms that the Attorney General is endowed with all common law powers. The *Wilbur* Court explained:

> The Attorney General . . . may, in the absence of some express legislative restriction to the contrary, exercise all such power and authority as public interest may, from time-to-time require, and may institute, and conduct all such actions and proceedings as he deems necessary for the enforcement of the laws of the state, the preservation of order, and *the protection of public rights."*

*Id.* at 558. (Emphasis in original).

It is interesting to note that the Attorney General has emphatically argued that the court should not consider the independent claim until the Rule 80C review has been completed. Obviously, he seeks to reserve the right to seek more consideration from the acquiring corporation than authorized under the Superintendent's decision if the court agrees to modify the conclusion by the Superintendent. He wants "a second bite at the apple." For this reason, the court has determined that the motion to dismiss the independent claim must be determined first and consider whether it is truly an "independent" claim, whether there is clear authority apart from the legislative scheme of administrative review or whether Rule 80C is the sole remedy and authority in the Attorney General under the circumstances.

Consumers lends support to the Attorney General's position that he is authorized by the common law to bring the independent claim. Consumers for

4

Affordable Health Care argues that the independent claim is simply asking the court to invoke its equitable jurisdiction over the matter and to provide a remedy of disgorgement if an updated valuation should be approved in excess of $81.69 million.

The Attorney General's independent claim is, at its essence, an attack on the inaction of the Superintendent of Insurance. Specifically, the Attorney General accuses the Superintendent of failing to accept an updated valuation of Blue Cross/Blue Shield of Maine which is part of his statutory duties. 24 M.R.S.A. § 2301(9-D)(I). In this sense, it cannot be characterized as an independent claim. There is no true independent basis for relief from agency action. Instead, the claim is a replication of the Attorney General's 80C appeal and as such it is properly characterized as a collateral attack. The Attorney General attempts to justify the procedural posture he has created by reliance upon the wide latitude given to him, largely by common law, in the enforcement of charitable trusts. *Fitzgerald v. Baxter State Park Authority*, 385 A.2d 189, 194-95 (Me. 1978); 5 M.R.S.A. § 194. There is nothing exceptional or controversial about the proposition that the Attorney General has broad oversight powers of charitable trusts. However, that broad principle is not unbounded.[1]

The Attorney General argues that the statutory language in 5 M.R.S.A. § 194-A(4) endorses his independent enforcement authority. He also refers to P.L. 1997, ch. 344, § 11(6) for the proposition that the Attorney General's charitable trust authority was not limited by the Act, and therefore must encompass the ability to bring the present independent claim. The relevant portion of chapter 344 states: "This Act does not limit

---

[1] The court notes with interest that the Superintendent of Insurance is represented in these proceedings by private counsel rather than an assistant attorney general normally assigned to the Bureau of Insurance. While the *Baxter State Park Authority* was considered a form of charitable trust, it also was clearly considered by the Court to be a state agency.

5

in any way the Attorney General's charitable trust authority or the Superintendent of Insurance's authority under the Maine Revised Statutes, Title 24 and Title 24-A except as expressly provided in this Act." *Id.* The Attorney General's reliance on this language as evidence that he may bring the present independent claim is predicated on the false assumption that the Attorney General's charitable trust authority includes the ability to collaterally attack an order of a State agency. It is the court's conclusion that the Attorney General's authority does not extend this far. This conclusion is supported by doctrinal as well as practical reasons.

While the facts in *Lovell v. One Bancorp*, 614 A.2d 56 (Me. 1992) are somewhat different from the present case, the court's analysis there is useful. The court concluded that the statutory scheme governing the Superintendent of Banking's authority to approve mutual-to-stock conversions displaced private common law claims. Interested parties could, however, appeal from the Superintendent's decision to the Superior Court pursuant to M.R. Civ. P. 80C. *Id.* at 62. So, too, it seems that the Attorney General's independent claim is displaced by the legislative preference, expressed through statute, for the Superintendent of Insurance to determine Blue Cross/Blue Shield of Maine's fair market value. 24 M.R.S.A. § 2301 *et seq.* This delegation of authority to highly specialized state agencies is well established and has been revealed as a preferable way to resolve disputes in technical areas such as insurance. To allow the Attorney General to bring this independent claim would interpose the court in what is primarily the business of the Superintendent of Insurance as it has been circumscribed by the Legislature. This action would substantially debilitate the very purpose for which the administrative agency was created; to wit, to dispose of technical issues on which the agency has expertise. The principles of administrative law are not suspended

6

in this case by bare reference to the Attorney General's broad authority in the oversight and enforcement of charitable trusts. This court declines to carve out an exception for the Attorney General that will have such a destabilizing effect on the work of administrative agencies and result in court jurisdiction inconsistent with the legislative scheme of regulation.

This action comes within M..R. Civ. P. 80C. The Rule provides that the manner and scope of review shall be governed by 5 M.R.S.A. §§ 11007(2) - 11007(4). While subsection 3 of that statute requires the court not to substitute its judgment for that of the agency in questions of fact, subsection 4 of that same provision authorizes the court to remand for further proceedings or to modify the decision. If the Superintendent has violated a statutory provision, exceeded his authority, or otherwise violated the mandate of section 11007(4)(C), the court may modify the decision or require further proceedings for determination of value. Should this court, pursuant to Rule 80C proceedings, determine that the Superintendent was in error and remand the matter to the Superintendent, he may well conclude, after appropriate proceedings, that the appraisal was untimely and make a determination that the value of the assets of Blue Cross/Blue Shield of Maine was greater than that found in his earlier decision. This, then, would cause the Superintendent to modify his decision and his approval of the demutualization and sale of assets. This dismissal of the independent claim should in no event be considered a determination whether the Attorney General, on behalf of the charitable trust, could pursue an independent common law and statutory action against Anthem for disgorgement of funds in accordance with the Superintendent's amended order. The court notes that in such a case, the action would be a claim by the Attorney

7

General on behalf of the charitable trust created by statute against a third party, not a state administrative agency .

For the reasons stated above, the entry will be:

The motion of Anthem Insurance Companies, Inc. and Anthem Health Plans of Maine, Inc. to dismiss the Attorney General's "independent" claim is GRANTED; the Superintendent of Insurance's motion to strike the independent claim is considered by the court to be a motion to dismiss and is GRANTED.

Dated: May____, 2001

Donald H. Marden
Justice, Superior Court

8

STATE OF MAINE

KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-00-037
& AP-00-042

D\+M - KEN  ١٨/٠٠/٠٠

CONSUMERS FOR AFFORDABLE
HEALTH CARE, *et al.*,

Petitioners

v.

ALESSANDRO IUPPA,
SUPERINTENDENT
OF INSURANCE, *et al.*,

Respondents

ORDER ON PETITION
FOR REVIEW OF FINAL
AGENCY ACTION PURSUANT
TO M.R. CIV. P. 80C

This matter is before the court on petition for review of final agency action pursuant to M.R. Civ. P. 80C. The petitioner is a nonprofit social welfare corporation concerned with the delivery of health services in the State of Maine. It is joined by the Attorney General of the State of Maine who filed a separate action, AP-00-042, which has been joined. The petitioners seek to have this court find erroneous the action of the Superintendent of Insurance in determining a value for Blue Cross/Blue Shield of Maine in conjunction with a conversion from a nonprofit health services organization to a stock corporation.[1]

Because the history, both statutorily and procedurally, is important to the court's analysis, it will be reviewed here. As described by the Superintendent in his 85-page decision and order, Associated Hospital Service of Maine, d/b/a Blue Cross and Blue Shield of Maine, and Anthem Insurance Cos., Inc., applied to the Superintendent of the

---

[1] The Attorney General's petition carried an independent claim for relief. The Superintendent of Insurance moved to strike the independent claim and Anthem Insurance Cos. moved to dismiss the independent claim. By its Decision and Order of May 18, 2001, the court granted the motion and the 80C review is the only matter presently before the court.

Maine Bureau of Insurance for approval of a series of related transactions. It was proposed that Blue Cross/Blue Shield would convert from a nonprofit hospital and medical service organization to a domestic stock insurance company named AHS Liquidating Corporation. Anthem Insurance Cos.'s Maine-based domiciled subsidiary, Anthem Health Plans of Maine, Inc., would be authorized to transact insurance business in the State of Maine. Immediately upon the conversion of Blue Cross/Blue Shield to a stock insurer, AHS Liquidating was to sell substantially all of its assets to Anthem Health Plan. Upon the sale of the assets, AHS Liquidating would dissolve and the funds representing the proceeds of the asset sale to Anthem, less liabilities, were to be placed into a charitable trust for the benefit of the Maine Health Access Foundation, Inc. which was established under statute by order of the Superior Court. Funds in the charitable trust were to be used pay off the terminal liabilities and any net proceeds were to be conveyed to the charitable foundation.

In 1997, the Legislature clarified the 100% charitable status of Blue Cross/Blue Shield of Maine in the event of its conversion to a stock insurer prior to December 31, 2000. It required Blue Cross/Blue Shield to file an ownership interest and charitable purposes statement with the Attorney General, who was then charged with the responsibility of filing an action in Superior Court seeking approval. These actions were taken and the statement of charitable interest and charitable purposes was approved by the Superior Court in 1998. The 1997 law also recognized that Blue Cross/Blue Shield was subject to some oversight by the Attorney General, as the representative of the charitable ownership interest, and by the Superintendent of Insurance, as the proper regulator of the insurance-like functions of Blue Cross/Blue Shield. These statutes, 5 M.R.S.A. § 194-A and 24-A M.R.S.A. § 2301(9-D), established

2

procedures for Blue Cross/Blue Shield, the Attorney General and the Superintendent to follow should Blue Cross/Blue Shield decide to convert to a stock insurer. In accordance with these statutes, Blue Cross/Blue Shield filed a charitable trust plan with the Attorney General, the Attorney General filed an action with the Superior Court seeking approval of the modified charitable trust plan, and the court approved the modified version.

In July of 1999, the Board of Directors of Blue Cross/Blue Shield of Maine announced the conversion plan and agreement to sell assets. A formal filing of the proposal was made with the Superintendent of Insurance on September 15, 1999. In addition to consideration of extensive filings by the applicants and interested parties, the Superintendent also held public comment portions of public hearings at locations around the State of Maine. The office of the Superintendent took more than 10 months for consideration of the matter with its staff spending over 6,000 hours in review of filed material. Independent experts were retained by the Superintendent. Dated May 25, 2000, the Superintendent issued his Decision and Order approving the applications to convert Blue Cross/Blue Shield to a for-profit stock insurer and to voluntarily dissolve. The approval order also included the applications of Anthem to acquire the assets and liabilities of the converted Blue Cross/Blue Shield. All approvals were subject to some 35 conditions as spelled out in the order. None of the 35 conditions would appear to be matters for review by this court.

The petition of Consumers Affordable Health Care seeks "reversal" of that portion of the Superintendent's decision that established a value of the outstanding stock of AHS Liquidating Corporation. It alleges the decision violates state law and is not supported by substantial evidence in the record. It asks the court to reverse the

3

agency action under appeal,[2] declare the Superintendent's decision establishing the value to be in violation of state statute and award costs and fees in the action. The Attorney General, in its petition for review, alleges that the Superintendent's decision is in violation of statutory provisions, affected by an error of law, and unsupported by substantial evidence on the record insofar as it determined the fair market of the aggregate equity of Blue Cross upon conversion. The complaint specifically advises the court that it does not seek to reverse the approval of the conversion and does not seek to block or require a rescission of the sale of the assets. Rather, the Attorney General requests only to "reverse" the Superintendent's decision and "to require Blue Cross/Blue Shield to update the statutorily mandated appraisal of the fair market value of the aggregate equity of the converted company." Petition *Ketterer v. IUPPA*, AP-00-42.

Title 5 M.R.S.A. § 194-A, located within that title dealing with administrative procedures and services of state government, more particularly the Office of the Attorney General, specifically dictates that a nonprofit hospital and medical service organization is a charitable and benevolent institution and a public charity with its assets held for purposes of fulfilling the charitable purposes of the organization. 5 M.R.S.A. § 194-A(1)(K) (Supp. 2000). Such an organization may not convert to a domestic stock insurer under Title 24 M.R.S.A. § 2301(9-D) unless the Superior Court first approves the organization's charitable trust plan and outlines the Attorney General's responsibility thereto. The statute specifically provides that the charitable trust shall receive the ownership interest in the organization following a conversion to a

---

[2] At oral argument, petitioner stressed that it did not desire to overturn the entire transaction, simply that portion dealing with valuation on behalf of the Foundation.

domestic stock insurer provided it meets certain conditions. 5 M.R.S.A. § 194-A(2). The section also provides that if the organization materially changes its form on or before December 31, 2000, 100% of the fair market value of the organization will be owned by the charitable trust and the charitable trust shall be defined with specific conditions. *Id.* The section further provides a definition of "fair market value" as:

> The value of an organization or an affiliate or of the assets of such an entity determined, consistent with Title 24, section 2301, subsection 9-D, as if the entity had voting stock outstanding and 100% of its stock were freely transferrable and available for purchase without restrictions. In determining fair market value, consideration must be given to value as a going concern, market value, investment or earnings value, net asset value and a control premium, if any. If a charitable trust receives, at the time of conversion, 100% of the shares of the then outstanding stock of the converted domestic stock insurer, the charitable trust is regarded as having acquired the fair market value of the organization unless the Superintendent finds that such outstanding stock does not represent the fair market value of the organization.

5 M.R.S.A. § 194-A(2)(G).

Finally, with regard to Title 5, the court notes the provision of section 194-A(5)(D) which says:

> In approving, disapproving or approving with modification a charitable trust plan, the Superior Court may not review or decide the methodologies for determining the fair market value of the organization, the methodology for allocating and transferring to the owners the ownership interest identified in the statement of ownership of interest and charitable purposes approved by the Superior Court of a fair market value of the organization. . . .

The responsibility of the Superintendent of Insurance in this scheme is found in the Insurance Code, Title 24 M.R.S.A. at 2301(9-D) which provides for the conversion to a domestic stock insurer. First the statute authorizes a nonprofit hospital and medical service organization to convert to a domestic stock insurer subject to the provisions of the section. It defines a conversion plan as a *"written plan* that sets forth the provisions

5

required by the Superintendent, that is filed with the Superintendent pursuant to this subsection, that sets forth a complete description of the proposed conversion and that contains sufficient detail to permit the Superintendent to make the *findings required* under this section." 24 M.R.S.A. § 2301(9-D)(B)(4). (emphasis supplied). Subsection 9-D also contains a definition of "fair market value" as "the value of an organization or an affiliate of the value of the assets of such an entity determined as if the entity had voting stock outstanding and 100% of its stock were fully transferrable and available for purchase without restrictions. In determining fair value, consideration must be given to value as a going concern, market value, investment or earnings value, net asset value and a control premium, if any." *Id.* § 2301(9-D)(B)(6).

The section specifically provides that the nonprofit hospital and medical service organization may amend its charter to become a domestic stock insurer in compliance with a plan that is "approved by the Superintendent after an adjudicatory hearing on the proposed conversion." *Id.* § 2301(9-D)(C). The section goes on to require the Superintendent to commence review of a conversion plan upon receipt of the Superior Court's approval of the charitable trust plan but with the mandate that he may not issue final approval of a conversion plan unless he finds that: "The terms and conditions of the conversion plan are *fair and equitable* and, in determining what is fair and equitable, consideration *may* be given to, but is not limited to, the factors set forth in subparagraph L of section 9-D." *Id.* § 2301(9-D)(E). Subparagraph L reads:

> In making a determination under paragraph E(1) as to whether a conversion plan is *fair and equitable* the Superintendent shall consider, among other factors, the following:
> (1)     Whether the conversion plan complies with the provisions of and purposes of this subsection and any rules of the Superintendent that may be adopted under this subsection; and

(2)     Whether the conversion plan would adversely affect, in any manner, the services to be rendered to be subscribers.

The statutory requirement in subsection 9-D primarily at issue in this review is subsection I:

The conversion plan must include an appraisal of the fair market value, or range of values, of the aggregate equity of the converted stock insurer to be outstanding upon completion of the conversion plan and, if a range in value, the methodology for fixing a final value coincident with the completion of the transactions provided for in the conversion plan.
(1)     The appraisal *must enable determinations of value* for purposes of:
    (a)     The amount of cash or other assets that subscribers of the charitable trust will be entitled to receive, without consideration, under the provisions of the conversion plan required by paragraph E, subparagraphs (3) and (4); and
    (b)     The price of any shares to be issued pursuant to the optional provisions of a conversion plan permitted by paragraph G.[3]
(2)     The appraisal required by this paragraph must be prepared by persons independent of the organization, experienced and expert in the area of corporate appraisal and acceptable to the Superintendent. The appraisal must be in a form and content acceptable to the Superintendent and contain a complete and detailed description with the elements that make up the appraisal, justification for the methodology employed and sufficient support for the conclusions reached in the appraisal.

(emphasis supplied).

A further provision in subsection 9-D(I) is its subsection (5), a mandate that appears to be relevant to whether the Superintendent of Insurance has the legal authority to simply modify a valuation without jeopardizing the complete approval. The section states, "[i]n those instances when the Superintendent determines that the appraisal is materially deficient or substantially incomplete, the Superintendent may deem the entire conversion plan materially deficient or substantially incomplete and

---

[3] This paragraph authorizes a provision in a conversion plan in which the converted stock insurer would make a simultaneous offer of its shares of its capital stock  for cash to officers, directors, or employees. The shares offered must be "priced in a manner consistent with the fair market of the aggregate equity of the converter stock insurer to be outstanding following the completion of the conversion plan, established pursuant to paragraph I." 24 M.R.S.A. § 2301(9-D)(G).

7

decline to further process or reject the application for conversion." *Id.* § 2301(9-D)(I)(5). The language is not mandatory. It is obviously there for a reason which may give some insight into the overall statutory scheme created by the Legislature.

In this instance, the applicant did file an appraisal with its conversion plan and the Superintendent found that appraisal was prepared by persons sufficiently independent of Blue Cross/Blue Shield, and sufficiently experienced and expert in the area of corporate appraisal. The appraisal date was "as of July 13, 1999." Superintendent's Decision, p. 37. The Superintendent concluded from his interpretation of the law that "the statute neither required nor anticipates that the Superintendent or any intervenor would file a competing appraisal. Rather, the statute contemplates a scenario whereby the Superintendent and intervenors would test the reasonableness of the appraisal submitted as part of the conversion plan." *Id.* The Superintendent further interprets his mandate that 24 M.R.S.A. § 2301(9-D)(I) "[r]equires the filing of an appraisal that sets forth the fair market value of the aggregate equity of the converted stock insurer." *Id.* That phrase, "the aggregate equity of the converted stock insurer," as the Superintendent understands it and in the context of the Conversion Statute, means the fair market value of AHS Liquidating (the converted stock insurer) after having accounted for the liabilities of Blue Cross. In other words, it is the "fair market value of the Foundation's 100% ownership interest in BCBSME following the conversion with the conversion being the mechanism to account for Blue Cross liability." *Id.* The Superintendent then goes on to utilize the appraisal submitted with the plan for approval as "the starting point" for determining the Foundation's interest in the charitable asset. In this case, as of July 13, 1999, that was $102.5 million. After some discussion with regard to substantive challenges, the Superintendent concluded:

> Based on the foregoing and the totality of the testimonial and documentary evidence in the record, the Superintendent finds that the H.L.H.Z. appraisal utilized reasonable methodologies in ascertaining the fair market value of the converted insurer's aggregate equity as of July 13, 1999, and the value reached by H.L.H.Z. is equally reasonable, represents the fair market value of the aggregate equity of the converted insurer and is supported by evidence in the record, thereby satisfying the legal requirements contained in 24 M.R.S.A. § 2301(9-D)(I).

*Id.* p. 38. Then, having concluded that the valuation was reasonable, the Superintendent determined to ascertain the "aggregate equity to be owned by the Foundation upon conversion, that is, the amount of assets the Foundation would be entitled to receive." *Id.* p. 39.

At this point, the Superintendent reasoned forward to determine the aggregate equity of the Foundation's interest in the converted insurer. Addressing the complaints by parties to the proceeding that he was required, under their interpretation of the statute, to determine a fair market value of Blue Cross/Blue Shield as of the date of conversion, i.e., the date of closing of the proposed transaction, the Superintendent presented the following reasoning:

First, the Superintendent concludes that the statutes do not require the Superintendent to determine the fair market value of Blue Cross/Blue Cross but, instead, to determine the fair market of the aggregate equity held by the Foundation in the converted insurer which determination would be based upon the appraisal filed with the conversion plan. Secondly, he concluded that to require an appraisal as of the date of completion would render the application of the statute an absurdity since the date of completion of the plan was not established at the time of his approval, that the valuations would be changing over time, that it is impossible to obtain an appraisal as of a date of closing and complete a closing on the same day and that his mandate was to

9

determine whether the fair market value suggested was, under statutory language, 'fair and equitable' or in his decision, "fair and reasonable."

*Id.* at 39.

The Superintendent goes on to rely on statutory interpretation as required in *Kimball v. Land Use Regulation Commission,* 2000 ME 20, 745 A.2d 387, and *Coker v. City of Lewiston,* 1998 ME 93, 710 A.2d 909 (the statutory scheme from which language arises must be interpreted to achieve a harmonious outcome. Statutory language shall not be construed to effect absurd, illogical or inconsistent results). The Superintendent further analyzes the statutory provision as part of the overall regulatory scheme. Further analysis illustrates the Superintendent's understanding of the intent of the legislation, to mandate filing an appraisal in advance of any adjudicatory hearing and to avoid a circular process caused by a requirement for subsequent appraisals. The Superintendent concludes that the Legislature intended the appraisal provide a baseline fair market value of the aggregate equity of the converted insurer which would be analyzed through the approval process and that its use is to enable a determination of value of the amount the Foundation would be entitled to receive. 24 M.R.S.A. § 2301(9-D)(I)(1). Using the appraisal as a baseline, the reviewing court could then apply an analysis of subsequent financial transactions and results, utilize the requirements of the statute and reach a conclusion as to the valuation of the aggregate equity in the converted insurer for purposes of his approval.[4]

---

[4] The Superintendent's responsibility was to approve a conversion plan. Included in that plan were the responsibilities of the Insurance Bureau to regulate the insurer that resulted from that process. In some respects, the offer by Anthem to purchase the assets was somewhat coincidental to the conversion approval. However, having determined the value and realizing that the offer to purchase assets was at least as great as its value, the credibility of the overall transaction seemed to be confirmed.

10

The Attorney General and the Consumers for Affordable Health Care argue that the decision is tainted by an error of law caused by incorrect interpretation by the Superintendent of the fair market value appraisal required by Blue Cross/Blue Shield of Maine. In essence, they argue that any appraisal contained in the conversion plan must provide a value of the equity of the converted insurer upon completion of the conversion plan. Consumers for Affordable Health Care argues that the Superintendent read the mandated "valuation date" out of the conversion statute. The Attorney General argues that the appraisal must be designed with a forward look to estimate the value at the time of completion of the plan. In that regard, petitioner asserts that the decision is invalid as based upon filings and not in conformance with statute. It is further argued that the fundamental error by the Superintendent is his conclusion that an appraisal cannot be presented to him for consideration if it is based upon a future date, i.e., the closing date which represents the completion of the plan. Further, it is argued that the Superintendent did not comply with the expert opinion of the appraiser that certain factors would be required in considering an update of the appraisal, factors which were not analyzed and put into evidence.

In response, the Superintendent argues that the statute only requires a single appraisal and makes no mention of or inference for subsequent or supplemental appraisals. Secondly, the statute requires that the appraisal must be included in the proposed conversion plan. The conversion plan initiates the submission of the application and starts the entire proceeding. Consequently, the appraisal must be in place at the initiation of the process. Further, since the approval or disapproval date is unknown, determining the closing date is even more speculative and no target time for consideration of a value is available. In addition, since the standard obligation of the

11

Superintendent is to determine whether the conversion plan is fair and equitable, the Superintendent first needs to accept the application and appraisal and then may independently review.

On this point, a preliminary observation must be made. At a certain point in the proceeding, the Superintendent determined from the application by Blue Cross/Blue Shield of Maine that its conversion plan was complete, thereby initiating his review process. That application and plan contained an appraisal based upon a valuation date of Blue Cross/Blue Shield's leadership approved the transaction, July 13, 1999. The record indicates the Superintendent solicited objections to his finding that the application was complete and received none from either petitioner. If the appraisal was founded upon an incorrect valuation date based upon the petitioner's interpretation of the statute, was it not incumbent upon them to object to the Superintendent's finding of completeness? Had they done so, and had they convinced the Superintendent of their interpretation of the statute, he could then have rejected the application as not in compliance with the statutory requirements.

The Superintendent argues under *Kimball* that to follow the petitioner's interpretation of the statute would lead to an absurd result, or, more particularly, a circular requirement leading to an impossibility. The Superintendent has the responsibility to evaluate the appraisal and determine whether it leads to a fair and equitable result. In order to be determined as of the date of completion of the plan, it would have to predicated upon a value under the conditions that exist after the approval by the Superintendent. Requiring that approval would place the appraisal process at the end of the proceedings rather than the beginning as required by statute. This circular reasoning leads the Superintendent to believe that this result could not

12

possibly have been the intent of the Legislature in order to comply with the context of the entire statutory scheme.

Petitioner argues that there is no other possible interpretation of the statute except one that would cause the Superintendent to conclude that he must find the fair market value of the aggregate equity from an appraisal based upon the completion of the plan. In other words, that the term "outstanding upon completion of the conversion plan" modifies the "appraisal" or the "fair market value." However, the Superintendent argues that it is just as reasonable and more compelling to consider the statute requiring that the term "outstanding upon completion of the conversion plan" modifies the "aggregate equity" and not the "appraisal" or "fair market value." If there are two reasonable interpretations of this statute creating prima facie evidence of an ambiguity, this court looks to the deference issue.

The Attorney General argues that the Superintendent is not entitled to the deference provided by case law. "Special deference is due when the issues subject to review lie within the scope of the agency's technical expertise." *CWCO, Inc. v. Superintendent of Insurance*, 1997 ME ¶ 6, 703 A.2d 1258, 1260 (citing *Maine AFL-CIO v. Superintendent of Insurance*, 595 A.2d 424, 429 (Me. 1991) (agency's interpretation of technical statutes and regulations given due consideration)). The Attorney General argues that this is a new statute created expressly for the transaction now before the court and that such a series of circumstances is new both as to the law and the facts to the State agency. The Attorney General argues, therefore, that the Superintendent of Insurance does not possess the necessary expertise or particular technical knowledge to be given deference in this instance. The argument is incorrect for two reasons. First, the court must assume that the Legislature determined that the Bureau of Insurance did

possess the necessary expertise or, was in possession of greater expertise than any other agency, to conduct the review. Secondly, the statute contemplates the existence of an ongoing domestic stock insurer as one of the options to Blue Cross/Blue Shield of Maine. Rather than liquidating upon sale of assets, the applicant could have simply continued to carry on business as a regulated for-profit insurance company. Indeed, one of the requirements of the Superintendent is to determine the financial credibility of the resulting domestic stock insurer based upon all of the finances of the case. Further, the Superintendent and the Bureau of Insurance is constantly making determinations in its certificate of authority licensing functions as to the financial capability and values of insurers for the protection of the insured public of Maine. The Superintendent is entitled to a great deal of deference under these circumstances.

In his decision, the Superintendent provides the following definition:

> Aggregate, equity, as defined previously, represents the charitable Foundations ownership interest in the converted insurer. Assuming any conversion takes place prior to December 31, 2000, the charitable Foundation holds a 100% interest. See 5 M.R.S.A. § 194-A(2)(A). As generally defined in valuation circles, equity is the fair market value of an entity as of the valuation date. In the context of this proceeding, the aggregate equity of the charitable Foundation in AHS Liquidating is equal to the fair market value of BCBSME plus any projected increases in net assets minus any liabilities reasonably attributable to BCBSME as fair market value deductions.

Decision p. 40. This court finds no principle of law or evidence to suggest that this is an unreasonable or unlawful interpretation of the requirement provided the Superintendent to comply with the conversion law and to determine the value of the aggregate equity at the completion of the plan for purposes of disposition to the foundation.

14

The second major thrust of petitioner's request for relief is their argument that there is insufficient evidence in the record for the Superintendent to determine the final value of BCBSME or that his decision as to value is not supported by substantial evidence in the record. The Attorney General argues that the petitioner wrongfully rejected the forecast of increased enrollment in Blue Cross/Blue Shield of Maine based upon an anticipated State contract and termination of the Tufts Plan. Petitioner further argues the Superintendent was required to consider the five factors presented by the applicant's expert and failed to do so and that the Superintendent did not consider longer term forecast in consideration of value rather than the oncoming fiscal year. Consumers for Affordable Health Care argues that the Superintendent did not consider a number of factors based upon expert opinion as well as statutory requirements. Changes in the marketplace, other stock transfers in the industry, and the like were omitted from the reasoning by the Superintendent and therefore he limited himself to the cash position of the applicant only.

The Superintendent responds that he was required only to find that the plan and therefore the value was fair and equitable and that he concludes that only one expert suggested an increase in valuation. The Superintendent did not find that expert's testimony credible in that regard. It must be noted that credibility of the witnesses is in the exclusive province of the factfinding agency. *Sprague Electric Co. v. Maine Unemployment Ins. Comm'n*, 554 A.2d 728, 732 (Me. 1988). The Superintendent enumerates the factors that were considered and rejects the idea that his findings could be based upon any precise information or mathematical formula. For example, he did not consider evidence with respect to the value of stock in the marketplace because he was aware that with regard to Blue Cross/Blue Shield of Maine there were only one

15

credible proposal put forward and that was the Anthem offer. Further, the Superintendent notes that there is no evidence anywhere on this record to suggest that the final value of the aggregate equity should be higher than his conclusion.

A review of final agency action brought in the Superior Court is a process pursuant to 5 M.R.S.A. § 11001 *et seq.* known as the Maine Administrative Procedure Act. Title 5 M.R.S.A. § 11007 provides that this court may affirm the decision of the Superintendent, remand the case for further proceedings as described by the court, and reverse or modify the decision if the court finds one of six possible deficiencies. They are that the decision is in violation of constitution or statute, in excess of the statutory authority of the agency, made upon unlawful procedure, affected by bias or error of law, unsupported by substantial evidence on the whole record or arbitrary or capricious or characterized by abuse of discretion. The petitioner argues that the Superintendent's decision as to value is affected by error of law and unsupported by substantial evidence. The statute provides a further requirement that the court shall not substitute its judgment for that of the agency on questions of fact.

This deference as to the facts has been extended by case law to affording proper deference to the agency's interpretation of statutes which it administers. This court must accord the agency substantial deference "unless the statute plainly compels a contrary result." *In re Wage Payment Litigation*, 2000 ME 162, 759 A.2d 217, 221. *See also York Mutual Ins. Co. v. Superintendent of Ins.*, 485 A.2d 239, 241 (Me. 1984). In the final analysis, the Superintendent has determined, in keeping with the legislative scheme, section 2301(9-D) as requiring him to obtain an appraisal for determining the value of the aggregate equity of the converted insurer. Since the aggregate equity of the converted insurer can be affected by other options within the statute such as the

interest of subscribers and the interest of directors and officers, he determines the requirement of the date of the completed plan to affect the definition of aggregate equity and not the appraisal. This is one reasonable interpretation based upon plain language. There is nothing in this statute, plain language or otherwise, to compel a contrary result.

Whether there is more evidence on the record to suggest a different final valuation upon updated modification of the appraisal is not the question before the court. The question is whether there was substantial evidence to support the Superintendent's findings. Notwithstanding some evidence to the contrary, the court is satisfied that the Superintendent examined all of the evidence required by statute and all the evidence that comported with his interpretation of the statute and that required him to find in order to allow him to make a determination as to whether the conversion plan was fair and equitable. Section 2301(9-D)(l). His interpretation of the appraisal allowed him to be enabled to make a determination of value for purposes of liquidation to the Foundation. Section 2301(9-D)(I).

One final observation: 24 M.R.S.A. § 2301(9-D)(C) authorizes a nonprofit hospital and medical service organization to convert to become a domestic stock insurer pursuant to a conversion plan that is approved by the Superintendent. The appraisal to be included within the conversion plan must enable the Superintendent to make a determination of value for purposes of, among other things, determining the amount that the charitable trust will be entitled to receive. Section 2301(9-D)(I)(1)(a). In spite of the language of the Maine Administrative Procedures Act which allows this court to modify a decision of an administrative agency, responsibilities of the Superintendent of Insurance with respect to a conversion plan under Title 24 are not made up of severable

parts. It is one process of consideration of one conversion plan. The Superintendent may accept or reject the plan just as he may accept or reject the appraisal. The petitioner has provided no authority to suggest that the Superintendent may modify a part of the conversion plan or to modify a purchase agreement which provides the funding for the liquidation plan. While the petitioner suggests the court may require the Superintendent to have an additional appraisal performed in order to place a new value on the amount available to the Foundation, this would require a finding by this court that the approval of the conversion plan was in error as not founded upon a proper utilization of the statute. While this matter is moot given the conclusions by this court as to the application of the law and the evidence supporting the decision, it must be observed that it would be a rather extraordinary precedent for this court to impose upon the Superintendent an ability to modify a conversion plan which does not exist in Title 24.

For all the reasons cited herein, the entry will be:

The decision and order of the Superintendent of Insurance in the matter of the application of Associated Hospital Service of Maine d/b/a Blue Cross/Blue Shield of Maine to convert to a stock insurer and voluntarily liquidate and dissolve and in the matter of application of Anthem Health Plan of Maine, Inc. to acquire the assets of Associated Hospital Service of Maine d/b/a Blue Cross/Blue Shield of Maine and related transactions is AFFIRMED.

Dated: /2- 2 (-0/

Donald H. Marden
Justice, Superior Court

18